## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

CHARLES HINE,

      Plaintiff,

    v.

PRINCE GEORGE'S COUNTY,
MARYLAND,

      Defendant.

Civil Action No. TDC-20-2929

### MEMORANDUM OPINION

Plaintiff Charles Hine has filed a civil action against Defendant Prince George's County, Maryland ("PGC" or "the County"), in which he asserts claims of disability discrimination in violation of Titles I and II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–12165 (2018); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (2018); and related state and county laws. The parties have filed Cross Motions for Summary Judgment, which are fully briefed. The Court held a hearing on the Motions on February 2, 2024. For the reasons set forth below, the Cross Motions for Summary Judgment will be DENIED.

### BACKGROUND

Plaintiff Charles Hine is a deaf individual whose deafness is congenital and permanent. Although Hine's preferred means of communication is American Sign Language, he has a cochlear implant through which he can hear people talking. Hine works as a behavioral specialist and is able to drive to clients' homes without any restrictions relating to his deafness.

Prior to 2017, Hine served as a volunteer firefighter at three different fire departments in Pennsylvania. Hine began such service when he was approximately 10 years old, through a junior

firefighter program with the Limerick Fire Department, and eventually attended and graduated from a firefighting academy. After graduating, he joined the Exeter Fire Department, at which he served as a volunteer and part-time firefighter who was able to perform all required job functions, which included entering burning buildings. To perform his duties, Hine used his cochlear implant, a special cooling mask that protected the implant from damage, and a thermal camera. He also used a sign language interpreter during meetings. The Exeter Fire Department found Hine's performance to be exemplary.

In February 2017, after being contacted by a recruiter, Hine applied to become a volunteer firefighter and emergency medical technician ("EMT") with the Morningside Volunteer Fire Department, Inc. ("MVFD") in Prince George's County, Maryland. Pursuant to the Prince George's County Code, non-profit, incorporated volunteer fire companies like MVFD operate as instrumentalities of the County and are subject to its oversight.

To become a volunteer firefighter in the County, applicants are required to submit to a background investigation and a medical examination to determine whether they meet the qualifying standards prescribed by the County for operational firefighters. In January 2018, Hine cleared the requisite background investigation and was then referred to the County's medical vendor, Concentra Occupational Health ("Concentra"), for a physical examination.

On February 22, 2018, Concentra evaluated Hine and his medical history to determine whether he met the standards set forth in "National Fire Protection Association 1582" ("NFPA 1582"), entitled "Standard on Comprehensive Occupational Medical Programs for Fire Departments," which the County uses as its criteria for determining volunteer firefighters' medical and psychological fitness for duty. *See* J.R. 163, ECF Nos. 84 to 84-6. NFPA 1582 requires that applicants have a certain level of hearing ability, as determined by an audiometric test that

2

measures the volume of the least audible sound a person can hear, as measured in decibels ("dB"), upon hearing sounds of different decibels emitted at various frequencies, as measured in Hertz ("Hz"). Under NFPA 1582 Standard 6.5 ("the NFPA hearing standard"), the level at which an applicant can hear across a range of different frequencies must average to no higher than 40 decibels in the unaided, better ear. Although Concentra did not conduct a hearing test, it identified Hine's congenital hearing loss as an area of concern and requested a current evaluation of his hearing, including audiometric test results.

On March 8, 2018, the PGC Office of the Fire Commission notified Hine that he did not "meet the standards set forth by the Prince George's County Fire/EMS Department to become a member" of the MVFD because of his "[f]ailed medical examination (Hearing Loss)." J.R. 47. As part of the preliminary appeal process invoked by Hine, the County requested that he submit the results of a current evaluation by an audiologist, including any "treatment plan, diagnosis, prognosis, medication, and studies performed." J.R. 48, 53. In response, Hine submitted audiometric test results conducted by Penn Medicine in 2010 and a letter dated November 25, 2009 from a medical practice that discussed Hine's planned cochlear implant. His 2010 results recorded hearing levels of 45 dB at a frequency of 500 Hz, 40 dB at 1,000 Hz, 40 dB at 2,000 Hz, and 35 dB at 3,000 Hz. These results put Hine at the threshold of the required hearing level set forth in the NFPA hearing standard. Hine, however, has acknowledged that these results do not satisfy the requirements of the NFPA hearing standard.

On September 5, 2018, the PGC Office of Law sent to Hine a letter on behalf of the PGC Fire & Emergency Medical Services Department ("the PGC Fire Department") and the PGC Fire Chief advising that he needed to submit the results of an audiometric test conducted within the last

3

six months. On September 24, 2018, Hine responded with an email in which he requested that the County provide the hearing test at no cost to him. The County did not respond to that request.

On December 29, 2018, Hine submitted a letter from the Amin Medical Center, which advised that the 2010 hearing test results previously submitted by Hine would be sufficient for the County's purposes because Hine's permanent congenital deafness precluded any improvement in his hearing.

On February 13, 2019, the County sent a letter to Hine in which it stated that it had reviewed all submitted documentation and determined that he did not meet the standards to perform safely the essential functions of an operational firefighter, but it informed him that he could work in a volunteer administrative position with MFVD. Hine appealed the determination to the PGC Fire Commission, which affirmed the decision.

On June 12, 2019, Hine filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Civil Rights. The EEOC issued a Notice of Right to Sue on July 28, 2020, and Hine filed his Complaint in the present case on October 9, 2020.

In the presently operative Amended Complaint, Hine asserts claims of employment discrimination on the basis of disability, in violation of Title I of the ADA, 42 U.S.C. § 12112 (Count 1); the Maryland Fair Employment Practices Act (''MFEPA''), Md. Code Ann., State Gov't § 20–606 (West 2021) (Count 4); and a Prince George's County ordinance that prohibits discrimination in employment, Prince George's County, Md. Code ("PGC Code") § 2–222 (2022) (Count 5). In Count 2, Hine alleges a violation of Title II of the ADA, which provides that qualified individuals with disabilities may not be "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any

4

such entity." 42 U.S.C. § 12132. Finally, in Count 3, Hine alleges a violation of Section 504 of the Rehabilitation Act, which provides that qualified individuals with disabilities may not, solely by reason of their disability, "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). After discovery was completed, the parties filed the pending Cross Motions for Summary Judgment.

## DISCUSSION

In his Motion, Hine seeks summary judgment in his favor on all claims on the basis that the record evidence establishes that the County: (1) relied on a blanket policy to reject Hine as an operational firefighter without conducting an individualized assessment of his abilities or needs; (2) failed to determine whether Hine could perform the essential functions of an operational firefighter with a reasonable accommodation; and (3) imposed an additional financial burden on him because of his disability by requiring him to pay for a new hearing test not required of other applicants. Hine also asserts that he is presently entitled to nominal damages and injunctive relief and argues that he should receive compensatory and punitive damages, to be established at trial.

In its Motion, the County seeks summary judgment in its favor on all claims on the basis that the record evidence establishes that: (1) it is not a proper defendant in Counts 1, 4, and 5 because it is not an employer of MVFD volunteer firefighters, both because MVFD firefighters are volunteers and because their employer, if any, is MVFD rather than the County; (2) it engaged in an interactive process that was thwarted when Hine failed to provide additional hearing test results; (3) it offered Hine a reasonable accommodation that would have allowed him to volunteer in an administrative position at MVFD; (4) Hine's inability to meet the NFPA hearing standard demonstrates that there is no reasonable accommodation available to allow Hine to perform the

5

functions of an operational firefighter; (5) if permitted to serve as an operational firefighter, Hine would pose a direct threat to the health or safety of others in the workplace, which is a defense to an ADA claim pursuant to 42 U.S.C. § 12113(b); and (6) Hine's claim under the PGC Code is barred because Hine failed to exhaust administrative remedies. The County also argues that if it is found liable, any recovery by Hine is limited to nominal damages.

At the February 2, 2024 hearing, Hine's counsel clarified that through his Motion, Hine seeks summary judgment only on the narrow issue of whether the County violated the ADA and other identified statutes by failing to conduct an individualized assessment of whether Hine can perform the work of an operational firefighter with a reasonable accommodation and instead relying on a "blanket policy of rejecting deaf applicants." Pl.'s Mot. Summ. J. at 7, ECF No. 69. Hine's counsel further clarified that the result Hine seeks on its Motion is a ruling that the County violated the ADA and an order requiring the County to conduct an individualized assessment for Hine. Hine is not seeking a determination on whether, on the present record, Hine can perform the functions of an operational firefighter with a reasonable accommodation. Hine's counsel also clarified that the argument relating to the County's failure to pay for a hearing test is not a freestanding claim under the ADA or another statute but is instead asserted as a basis for rejecting the County's claim that it should prevail because Hine failed to provide such a test.

For its part, the County clarified that it is not presently seeking a finding on whether a reasonable accommodation existed at the time that Hine applied to MVFD that would have allowed him to serve as an operational firefighter.

Finally, the parties also agreed that Counts 1, 4, and 5 should be jointly evaluated under the standards applicable to claims under Title I of the ADA, and that Counts 2 and 3 should be evaluated together under the standards applicable to Title II of the ADA. Because this approach

6

is consistent with prevailing legal authority, the Court will focus its analysis on Hine's claims under Title I and Title II of the ADA. *See Peninsula Reg'l Med. Ctr. v. Adkins*, 137 A.3d 211, 220 (2016) (applying the ADA standard in evaluating a disability discrimination claim under the MFEPA); *Taylor v. Giant of Md., LLC*, 33 A.3d 445, 459 (Md. 2011) (stating that Maryland courts have a "history of consulting federal precedent in the equal employment area" when evaluating employment discrimination claims, including those based on Section 2-222 of the Prince George's County Code); *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (stating that "[c]laims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same'" (quoting *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995))).

## I.      Legal Standard

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one that 'might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.    Employment Relationship

As a threshold matter, the County argues that it is entitled to summary judgment on Hine's employment discrimination claims in Counts 1, 4, and 5 because the County is not an employer within the meaning of the applicable statutes. Title I of the ADA prohibits any "covered entity," which, as relevant here, is defined as an "employer" or "employment agency," from "discriminat[ing] against a qualified individual on the basis of disability," 42 U.S.C. §§ 12111(2), 12112(a). The MFEPA prohibits an "employer" from "discriminat[ing] against any individual . . . because of . . . disability unrelated in nature and extent so as to reasonably preclude the performance of the employment." Md. Code Ann., State Gov't § 20–606. Finally, the PGC Code prohibits any "employer" from "discharg[ing] or refus[ing] to hire any person . . . because of discrimination." PGC Code, § 2–222. As relevant here, an "employer" is "a person engaged in an industry affecting commerce who has 15 or more employees . . . and any agent of such person." 42 U.S.C. § 12111(5)(A); *see* Md. Code Ann., State Gov't § 20-601(d)(1); PGC Code, § 2–186(a)(8) (providing the same definition except requiring only one or more employees). Both the ADA and MFEPA define an "employee," in relevant part, as "an individual employed by an employer." 42 U.S.C. § 12111(4); Md. Code Ann., State Gov't § 20-601(c)(1)(i); PGC Code § 2–186 (failing to provide a definition of "employee").

The County's claim that it is not an employer for purposes of the claims under these statutes has two parts. First, the County asserts that it is not an employer of MVFD firefighters because

8

those positions are uncompensated, volunteer positions. Second, the County contends that even if MVFD firefighters are employees, it is MVFD, not the County, that is the employer for those positions.

## A.    Volunteers

Generally, when there is no evidence of compensation in a relationship, there is no employer-employee relationship for purposes of employment discrimination statutes. *See Haavistola v. Cmty. Fire Co. of Rising Sun,* 6 F.3d 211, 219 (4th Cir. 1993). However, in the context of volunteer positions, the absence of direct monetary compensation does not necessarily preclude an employment relationship because significant, indirect remuneration can constitute compensation. *Id.* at 221-22. The issue of whether certain benefits qualify as such "significant remuneration," or are instead "inconsequential incidents of an otherwise gratuitous relationship," generally "cannot be found as a matter of law" and is ordinarily left to the factfinder. *Id.*

In *Haavistola*, the court considered whether a volunteer firefighter who received no direct monetary compensation from the Maryland volunteer fire department for which she provided services was an employee for purposes of her discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. *Haavistola*, 6 F.3d at 213, 219. The court reversed the district court's grant of summary judgment, in part because it was based on the faulty conclusion that, as a matter of law, the non-monetary benefits that the plaintiff received as a volunteer firefighter were insufficient to render her an employee for purposes of an employment discrimination claim. *Id.* at 221-22. These benefits included a state-funded disability pension, survivors' benefits for dependents, scholarships for dependents upon disability or death, bestowal of a state flag upon death in the line of duty, group life insurance, tuition reimbursement for certain safety courses, workers' compensation coverage, tax exemptions for travel expenses, the ability to

9

purchase a commemorative vehicle license plate, and access to a method of obtaining certification as a paramedic. *Id.* at 221.

Here, MVFD volunteer firefighters were eligible for the following benefits: (1) a tax deduction of approximately $4,500, to be received each year after three years of service, *see* Md. Code Ann., Tax-Gen. § 10-208(i–1)(1)-(3) (West 2014); (2) a Length of Service Award Program that provides a monthly payment after 25 years of service, *see* PGC Code § 11–328; (3) a Blanket Life and Accident Insurance Policy which includes life insurance with a minimum death benefit of $50,000, disability benefits, medical expenses benefits, and family assistance, *see* PGC Code § 11–327; (4) a County death benefit of $15,000, *see* PGC Code § 11–329; (5) state death and disability benefits, *see* Md. Code Ann., Pub. Safety §§ 7–202, 7–203 (West 2022); (6) state workers' compensation, *see* Md. Code Ann., Lab. Empl. §§ 9–234(r), 9–402 (West 2016); (7) federal death and disability benefits, *see* 34 U.S.C. §§ 10281(a), (b) and 10284(7), (14); (8) free training courses through the PGC Fire Department, the Maryland Fire and Rescue Institute, and other state and federal agencies; and (9) certain competitive tuition reimbursement or scholarship programs. MVFD also provides free live-in quarters for qualifying members.

Where these benefits have value that is comparable to and in some ways exceeds the value of the benefits identified in *Haavistola*, they are sufficient to preclude summary judgment on this issue. *See Haavistola*, 6 F.3d at 222. Indeed, judges in this District have consistently applied *Haavistola* in denying summary judgment in cases involving similar kinds of benefits and finding that the question of whether the remuneration provided to volunteers rendered them employees could not be decided as a matter of law. *See, e.g., Finkle v. Howard Cnty.*, 12 F. Supp. 3d 780, 786 (D. Md. 2014) (in the case of a volunteer mounted search-and-rescue officer, holding that the court could not find, as a matter of law, that injury and death benefits were insufficient to establish

10

an employer relationship); *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 410 (D. Md. 2015) (reaching the same conclusion as to a volunteer EMT who received disability, death, and survivors' benefits); *Price v. Grasonville Volunteer Fire Dep't*, No. ELH-14-1989, 2014 WL 7409891, at *12 (D. Md. Dec. 30, 2014) (reaching the same conclusion as to a volunteer firefighter who received benefits comparable to those in *Haavistola*).

In the face of *Haavistola* and this long line of cases, the County unpersuasively relies on *Evans v. Wilkinson*, 609 F. Supp. 2d 489 (D. Md. 2009), in which the court held that a length of service program providing a monetary benefit after 20 years of service, a first-time homeowner's assistance program, and eligibility to apply for a scholarship program were insufficient to establish an employment relationship with a volunteer rescue squad member for purposes of an employment discrimination claim. *Id.* at 490, 495-96. First, the County mischaracterizes *Evans* as a decision by the United States Court of Appeals for the Fourth Circuit, and thus on par with *Haavistola*, when it is in fact a district court opinion that is not controlling authority. Def.'s Mot. Summ J. at 10, ECF No. 75-2. Second, *Evans* is inconsistent with *Haavistola* in that it relied in part on the conclusions that the plaintiff was not "financially dependent" on the benefits, that she had not "actually received" the benefits, and that there was no "guarantee" that she would receive the length of service program benefit. *Evans*, 609 F. Supp. 2d at 495-96. In contrast, *Haavistola* in no way considered financial dependence as a factor, and it considered numerous benefits, such as those to be provided in the event the plaintiff died or became disabled in the line of duty, which had not yet been received and for which there was no guarantee or even likelihood that they would ever be received. *See Haavistola*, 6 F.3d at 221. Finally, the grounds on which *Evans* sought to distinguish *Haavistola*—that the evidence did not show that the plaintiff had actually received any benefits or was even eligible for them—are not present here, as the record shows that an MVFD

11

firefighter is eligible from the start for certain benefits also available in *Haavistola*, including free training and life insurance. *See Haavistola*, 6 F.3d at 221. The Court therefore finds, pursuant to *Haavistola*, that in light of the evidence of the benefits provided to MVFD volunteer firefighters, the Court "must leave to a factfinder the ultimate conclusion" whether the relationship is one of civic philanthropy or whether the benefits are sufficient to establish an employment relationship. *Haavistola*, 6 F.3d at 222. The Court will therefore decline to grant summary judgment to the County on Counts 1, 4, and 5 based on this issue.

### B.      Joint Employers

Relatedly, the County argues that it cannot be held liable on the employment discrimination claims in Counts 1, 4, and 5 because to the extent that there is an employer of MVFD firefighters, it is MVFD, not the County. In response, Hine argues that the County is an employer under the "joint employment doctrine," which recognizes that "multiple entities may simultaneously be considered employers" for purposes of an employment discrimination claim. *Butler v. Drive Auto. Indus. of Am.*, 793 F.3d 404, 409-10 (4th Cir. 2015). To determine whether a party is an employer for this purpose, the Fourth Circuit has adopted a "hybrid test," which considers both the degree of control exercised over the employee and whether, "as a matter of economic reality," the employees are "dependent upon the business to which they render service." *Id.* at 413 (quoting *Haavistola*, 6 F.3d at 220). Under this test, courts consider the following factors:

(1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

12

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* at 414.

The inquiry into the employer-employee relationship is "fact-specific," and no single factor is dispositive. *Id.* at 414 & n.12. Nevertheless, because the issue of "control" over the employee is "the principal guidepost for determining whether multiple entities can be a plaintiff's joint employers," the first three factors are "the most important." *Id.* at 414-15.

As to the first factor, authority to hire and fire, the County claims that it has little involvement in hiring and firing decisions relating to MVFD volunteer firefighters because MVFD has the final decision on whether to accept someone as a volunteer. According to the affidavit of James McClelland, the former Deputy Fire Chief of the Volunteer Services Command within the PGC Fire Department, a volunteer fire company must choose to sponsor an applicant before the County will conduct a background investigation and medical examination, and even if the County notifies the volunteer fire company that the applicant has received favorable results on the investigation and examination, that company makes the ultimate decision on whether to accept the applicant as a volunteer firefighter. He further asserts that while the County has the authority to remove or restrict a volunteer firefighter's authority to act in an operational role, it cannot formally remove that individual from the membership of the volunteer fire company.

However, where the position sought by Hine was that of an operational firefighter, the County has effective authority to prevent the hiring of someone into that role because it makes the determination on whether that individual has passed the background investigation and medical examination and thus meets the requirements of NFPA 1582. Notably, as stated by McClelland in his deposition testimony, there is no federal, state, or county law requirement that the County apply NFPA 1582, so the County has made its own decision on what standards to apply, including as to the NFPA hearing standard, and could, through the fire chief, waive these self-imposed requirements in a particular situation. In contrast, McClelland has confirmed that MVFD has no authority to deviate from the County's requirements or to waive an NFPA requirement in order to accept someone to serve as an operational firefighter. The County also has the authority to "remove, restrict, or terminate a member's operational authority." J.R. 166. Thus, as a practical matter, the County makes decisions about operational firefighters that are akin to hiring and firing decisions; indeed, in this case, it was the County, not MVFD, which issued the letters to Hine notifying him that he did not qualify to serve as an operational firefighter, which effectively barred him from that role.

As to the second factor, day-to-day supervision, the County asserts that MVFD has responsibility for the day-to-day management of its volunteer firefighters. As stated by McClelland in his affidavit, volunteer fire companies operate through their own chains of command and are subject to "their own corporation's respective constitution, bylaws, and regulations for non-operational matters." J.R. 161. McClelland further asserts that there are no County personnel at MVFD to supervise its day-to-day functions and no County-enforced requirements relating to the number of hours to be worked by MVFD volunteer firefighters. At the same time, however, McClelland acknowledges that the County has operational authority over

14

volunteers, including over the directing of operations at the scene of a fire or other emergency, has the authority to restrict a volunteer's operational authority, and has shared disciplinary authority over volunteers.

As for the third factor, provision of the workplace and equipment, McClelland has asserted that MVFD owns "all of its own fire apparatus, emergency vehicles, and its own station building." J.R. 165. Notably, however, PGC Fire Chief Tiffany Green has testified that the fire trucks and equipment owned by volunteer fire companies are financed in part through County stipends and municipal funds, and that volunteer fire companies cannot make major purchases without the County's consent. Moreover, McClelland has stated that the County provides all of the firefighting gear and personal protective equipment used by all operational firefighters, including at MVFD, which includes helmets, boots, firefighter coats, and related items. The County also contributes operating funds for volunteer fire companies to purchase office, cleaning, and medical supplies; uniforms; and tools.

Thus, on these three most important factors, there is significant evidence supporting the conclusion that the County has some role, even if not the primary one, relating to hiring and firing, day-to-day operations, and the provision of the workplace and equipment. The record evidence also provides support for a finding that other relevant factors weigh at least in part in favor of a finding of joint employment. On the fourth factor, possession of employment records, while MVFD retains most records relating to volunteer firefighters, the PGC Fire Commission retains their application materials, training and certification records, and records relating to certain benefits. As for the sixth factor, provision of training, although MVFD volunteer firefighters do not attend the PGC Fire Department's Training and Leadership Academy, the County provides training relating to the safety equipment and operational reporting, and through the County's

partnerships, volunteer firefighters receive free training through the Maryland Fire and Rescue Institute. On the seventh factor, whether the volunteer's duties are akin to a regular employee's duties, although commissioned firefighters have more extensive training than that of volunteers, a volunteer firefighter performs substantially similar duties as those who are commissioned. Thus, even if the remaining factors could be deemed to weigh against joint employment, where the Court's analysis does not place "the loci of effective control" over MVFD volunteer firefighters squarely with MVFD, *Butler*, 793 F.3d. at 415, and the evidence relating to the factors discussed above is sufficient to support a finding that the County is a joint employer of MVFD volunteer firefighters, the Court will not grant summary judgment to the County on Counts 1, 4, and 5 based on this issue.

## III.    Exhaustion of Administrative Remedies

On an additional threshold issue, the County asserts that it is entitled to summary judgment on Count 5 because Hine has not "asserted that [he] engaged in" procedures to be followed in asserting a complaint before the PGC Human Rights Commission, including pursuing an appeal through the Maryland state courts before filing the Complaint in this case. Def.'s Mot. Summ. J. at 27, ECF No. 75-2. The cited provisions, however, provide that the intent of the County ordinance is to allow a complaint "to proceed more promptly than possible under either Federal or State law" and that it is not intended "to create a duplicative or cumulative process to those existing under similar or identical Federal or State law." PGC Code § 2–185. Significantly, the statutory section referenced by the County does not impose any specific pre-suit requirement on Hine and states only that: "[a]ny party aggrieved by a final decision by the [Human Rights] Commission is entitled to file an appeal pursuant to Chapter 200, Title 7, Maryland Rules of Procedure." PGC

Code § 2–197(c). The plain language of this provision does not establish a requirement that the County pursue such an appeal before filing suit in federal court.

Regardless, the failure to exhaust administrative remedies is an affirmative defense that need not be pleaded in the complaint and is subject to waiver. *See Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849-51 (2019) (holding that the Title VII requirement that a plaintiff first file a charge of discrimination with the EEOC process is a claim-processing rule that may be forfeited); *cf. Jones v. Bock*, 549 U.S. 199, 212 (2007) (in discussing the exhaustion requirement of the Prison Litigation Reform Act, stating that "the usual practice under the Federal Rules is to regard exhaustion as an affirmative defense"). Under Federal Rule of Civil Procedure 8, a party must, in responding to a pleading, "affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c)(1). Generally, affirmative defenses not raised in a pleading are considered waived. *See Fort Bend Cnty.*, 139 S. Ct. at 1848, 1851-52 (affirming a determination that the defense of failure to exhaust EEOC remedies was forfeited because of the failure to assert it in a timely manner); 5C Charles Alan Wright & Arthur R. Miller Fed. Prac. & Proc. Civ. § 1394 (3d ed. 2023). Here, the County did not plead the failure to exhaust administrative remedies set forth in the PGC Code as an affirmative defense and has thus waived it.

Accordingly, both because the County has not provided legal authority establishing that Hine was required to complete any steps set forth in the PGC Code before filing suit, and because the County waived this affirmative defense, the Court will deny the County's request for summary judgment on Count 5 based on an alleged failure to exhaust administrative remedies.

## IV.    ADA Claims

Having addressed the threshold issues identified in the Cross Motions for Summary Judgment, the Court now turns to the merits arguments. As discussed above, Hine has clarified

17

that in his Motion, he seeks a finding that the County has violated the ADA by failing to conduct an individualized assessment of whether he can perform the essential functions of the role of an operational firefighter with a reasonable accommodation and instead denying his application based on a blanket policy, specifically, the NFPA hearing standard. As clarified at the hearing, Hine's argument applies both to his claims of employment discrimination in Counts 1, 4, and 5 and his claims of discrimination in public programs in Counts 2 and 4.

### A.    Legal Framework

Title I of the ADA, which addresses employment discrimination against persons with disabilities, provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The statute defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The term "essential functions" refers to the "fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n) (2023). As relevant here, discrimination against a qualified individual on the basis of disability that violates Title I includes:

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant; [and]

18

> (6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

42 U.S.C § 12112(b)(5), (6).  Generally, to establish a claim for employment discrimination on the basis of disability under Title I of the ADA, a plaintiff must establish that (1) the plaintiff has a disability; (2) the plaintiff was a qualified individual for the position; and (3) the employer took an adverse employment action, such as failing to hire the plaintiff, because of the disability.  *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015).

Title II of the ADA, which addresses discrimination against persons with disabilities in accessing public services or programs, provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  For purposes of Title II, a qualified individual is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 28 C.F.R. § 35.104 (2023).  As to discriminatory conduct, Title II requires that:

> (7)(i) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity . . . [and]

> (8) A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R. § 35.130(7)(i), (8). To establish a Title II claim under the ADA, a plaintiff must demonstrate that (1) the plaintiff has a disability; (2) the plaintiff is "otherwise qualified to receive the benefits of a public service, program, or activity"; and (3) the plaintiff was "excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of . . . disability." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

As stated at the hearing, for purposes of the Cross Motions, the County is not disputing that Hine has a disability for purposes of both the Title I and Title II claims, and it is not contesting whether the MVFD volunteer firefighter program is a public service, program, or activity within the meaning of Title II. Under these circumstances, the parties agree that, for purposes of the remaining arguments on the Cross Motions, the relevant legal standards are sufficiently similar that the analysis is effectively the same for both the Title I and Title II claims. Accordingly, the Court's analysis of the remaining arguments will apply to both sets of claims.

## B. Individualized Assessment

In his Motion, Hine seeks summary judgment on his claims based on the argument that the record evidence establishes that the County violated the ADA by failing to conduct an individualized inquiry or assessment to determine whether he can perform the duties of an operational firefighter with or without a reasonable accommodation and instead relying entirely on a blanket policy or standard, specifically the NFPA hearing standard, to disqualify him from serving as an operational firefighter. Although the relevant statutory language differs slightly between Title I and Title II, subject to certain exceptions, covered entities cannot use standards or criteria that would screen out qualified individuals with a disability unless such a qualification is shown to be necessary, and such entities must make reasonable accommodations or modifications

20

to allow persons with disabilities to participate in the relevant activity, whether it is employment or a public service or program. *See* 42 U.S.C. § 12112(b)(5), (6) (Title I); 28 C.F.R. § 35.130(7), (8) (Title II).  In considering these and other provisions of the ADA, courts have generally required that even when a covered entity uses general standards or criteria that are not met by the plaintiff, there must be an individualized inquiry into whether the plaintiff can engage in the relevant activity with a reasonable accommodation or modification.  In *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001), the United States Supreme Court considered whether PGA Tour, Inc., a non-profit organization that hosts professional golf tournaments, violated Title III of the ADA, 42 U.S.C. § 12182, which mandates that places of public accommodation operated by private entities provide persons with disabilities with "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations," § 12182(a), by barring an otherwise qualified golfer, Casey Martin, from competing in golf tournaments because he had a disability.  *PGA Tour, Inc.,* 532 U.S. at 668-69.  Specifically, Martin's disability prevented him from meeting the general requirement that he walk the golf course during the tournaments, but he could compete if he received a waiver of that requirement under which he would be permitted to use a golf cart.  *Id.* The Court referenced "the ADA's basic requirement that the need of a disabled person be evaluated on an individual basis" and held that "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration."  *Id.* at 688, 690.  In finding that Martin's request for a waiver to permit the use of a golf cart should have been granted, the Court concluded that the PGA's "refusal to consider Martin's personal circumstances in deciding whether to accommodate his disability runs counter to the clear language and purpose of the ADA."  *Id*. at 688.

The requirement of an individualized inquiry has also been applied to the question of whether an individual can perform the essential functions of a job with a reasonable accommodation under Title I of the ADA. *See, e.g.*, *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) ("In order to properly evaluate a job applicant on the basis of his personal characteristics, the employer must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question."); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 29 (1st Cir. 2002); *see also Weigel v. Target Stores*, 122 F.3d 461, 466 (7th Cir. 1997) (stating that the question of whether a plaintiff is a "qualified individual" "necessarily involves an individualized assessment of the individual and the relevant position"); *cf.* 29 C.F.R. Pt. 1630, App. (2023) (Interpretive Guidance on Title I of the ADA) (in the context of the prohibition on limiting or segregating disabled employees in 29 C.F.R. § 1630.5, stating that "[t]he capabilities of individuals must be determined on an individualized, case by case basis"). Likewise, the individualized inquiry requirement has also been applied to claims under Title II of the ADA. *See, e.g.*, *Marble v. Tenn.*, 767 F. App'x 647, 652 (6th Cir. 2019) (stating that, based on the Supreme Court's reasoning in *PGA Tour, Inc.*, "the individualized inquiry requirement also applies to requests for accommodation under Title II").

Courts have applied the requirement of an individualized inquiry to cases in which an employer or public service provider relied entirely on the plaintiff's failure to pass a test or medical examination intended to identify a disqualifying condition and failed to conduct an individualized inquiry to determine whether the plaintiff could actually perform the function or activity in question. In *Pandazides v. Virginia Board of Education*, 946 F.2d 345 (4th Cir. 1991), a case under the Rehabilitation Act, the Virginia Board of Education, which required teachers to pass the

22

National Teachers Examination ("NTE"), deemed a teacher with learning disabilities ineligible to teach because she repeatedly failed the Communications Skills portion of the NTE, and it refused to provide a waiver of that requirement even though she had an opinion from a psychologist that she was a competent and qualified teacher and that her disabilities had "no significant impact on her ability to teach." *Id.* at 347-48. In reversing a grant of summary judgment in favor of the employer, the Fourth Circuit held that the determination of whether the teacher was "qualified" to do the job required "more than simply determin[ing] whether or not [she] meets all of the stipulated requirements" but instead also required the consideration of "what the position she seeks actually requires" and "whether she can perform the 'essential functions' of" that position, "whether the requirements actually measure those functions," and whether a reasonable accommodation or modification "could be made to allow" the plaintiff to teach. *Id.* at 349-50.

In *Gillen*, the court found that there was sufficient evidence to support an ADA claim based on the denial of a EMT position to a one-handed woman, where the denial was based on a physician's determination that she could not perform the essential job function of two-handed lifting, but there had been no individualized examination of the effects of her disability or of her lifting ability. *Gillen,* 283 F.3d at 18-19, 32. In so ruling, the court stated that "[a]n employer cannot evade its obligations under the ADA by contracting out personnel functions to third parties," including using "a preemployment examination as conclusive proof of an applicant's physical capabilities." *Id.* at 31. Likewise, in *Rodriguez v. ConAgra Grocery Prod. Co.*, 436 F.3d 468 (5th Cir. 2006), the court reversed a grant of summary judgment in favor of an employer which had denied a laborer position to a plaintiff with Type II diabetes based on a medical test that showed that he had an elevated glucose level and the physician's conclusion that he had "uncontrolled diabetes," where there had been no individualized assessment of whether he could

23

actually do the job. *Id.* at 472, 481-82. Therefore, an employer or other entity which believes that a plaintiff's disability "inherently precludes successful performance of the essential functions" and in turn "fail[s] to make an individualized determination, as the ADA requires . . . thus acts at its own peril." *Holiday*, 206 F.3d at 644 (quoting *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 193 (3d Cir. 1999)).

In certain circumstances, an employer may be able to rely on a blanket qualification standard without an individualized inquiry, such as when the qualification standard is mandated by federal law. *See Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 570, 573 (1999) (holding that a company could terminate a truck driver for not meeting the vision requirement when the job qualification was not "of its own devising" but instead was a mandatory visual acuity standard established by federal regulation, in part because "[w]hen Congress enacted the ADA, it recognized that federal safety rules would limit application of the ADA"); *see* 29 C.F.R. §1630.15(e) (stating that it may be a defense to a charge of discrimination under Title I that "a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action . . . that would otherwise be required by this part"). Notably, in *Albertson's*, the Court relied on its finding that the regulation had "the force of law" and that waivers from the requirement were provided only as part of a program to collect data and information to be used in studying possible changes to the standard, not as a mechanism to allow relaxation of the standard in individual cases. *See id.* at 570, 575-76. The present case, however, is not one in which the qualification standard is mandated by law and there is no possibility of obtaining a waiver from it. Rather, McClelland and Michael White, the current Assistant Fire Chief of the Volunteer Services Command within the PGC Fire Department, have both acknowledged in their depositions that there is no federal or state law requirement to follow NFPA

24

1582, which was established by a private non-profit organization and which, as Green acknowledged in her deposition, is not enforced in its entirety.

Here, there is no serious dispute that the County rejected Hine's application based on the results of Hine's medical examination and Concentra's determination, based on his self-reported hearing test results, that he did not meet the NFPA hearing standard. There is also no material dispute that, although Hine requested an individualized assessment of whether, despite that hearing test score, he could still perform the job of an operational firefighter, no such individualized assessment occurred.   Accordingly, the County's absolute reliance on the results of a medical examination or a general policy without conducting an individualized assessment of whether Hine could actually perform the job with a reasonable accommodation runs contrary to the requirements of the ADA. *See, e.g.*, *PGA Tour, Inc.*, 532 U.S. at 690; *Gillen*, 283 F.3d at 29; *Rodriguez*, 436 F.3d at 482.

In the face of this failure, the County argues that the individualized assessment was not required because Hine did not make a sufficient threshold showing that he could perform the functions of an operational firefighter despite not meeting the NFPA hearing standard.   The County, however, has cited no authority for its claim that such a threshold showing is required, and the Court has found none.  Neither the Supreme Court in *PGA Tour, Inc.*, 532 U.S. at 90, nor the United States Courts of Appeals, have imposed such a requirement as a prerequisite to receive an individualized assessment. *See, e.g.*, *Gillen*, 283 F.3d at 29; *Rodriguez*, 436 F.3d at 481-82; *Holiday*, 206 F.3d at 643.  To the extent that any such showing was necessary, as discussed below, Hine provided such a showing by submitting information about his prior service as an operational firefighter with multiple fire departments in Pennsylvania.

The failure to provide an individualized inquiry into Hine's ability to perform the essential functions of the position, however, does not mean that Hine is entitled to summary judgment on his ADA claims and to receive his requested relief of a court order requiring the County to engage in the individualized inquiry. Even in the cases in which the Court found that the defendant did not engage in an individualized inquiry, there was no finding that the failure to do so was itself grounds to find liability on ADA claims. *See, e.g.*, *Gillen*, 283 F.3d at 33; *Holiday*, 206 F.3d at 646, 648. Hine has cited no authority for the claim that the Court must find liability based on the failure to provide an individualized inquiry in and of itself and that the remedy should be a court order requiring that process. Rather, the protections provided in Titles I and II of the ADA are limited to "qualified individual[s]." *See* 42 U.S.C. §§ 12112(a), 12132. Thus, regardless of whether the County imposed a discriminatory blanket policy or failed to engage in an individualized inquiry, Hine is entitled to a finding of liability only if he establishes that he was a qualified individual, which in turn requires a determination that he could perform the essential functions of an operational firefighter with or without a reasonable accommodation. *See Hohider v. United Parcel Serv., Inc.,* 574 F.3d 169, 192 (3d Cir. 2009) (stating that because the ADA incorporates the inquiry of whether a disabled individual is "qualified" into the definition of prohibited discrimination, an evaluation of whether the plaintiff is a "qualified individual" is required in order to determine whether "discrimination on the basis of disability [that] has occurred . . . is unlawful"). *Cf. Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346-47 (4th Cir. 2013) (in affirming a grant of summary judgment against an employee with partial permanent blindness because he was unable to show that he could perform the essential functions of his position with an accommodation, stating that "an employer who fails to engage in the interactive process will

not be held liable if the employee cannot identify a reasonable accommodation that would have been possible").

At the hearing, however, the parties agreed that neither side is seeking a ruling on summary judgment that Hine can perform the role with or without a reasonable accommodation. Moreover, on the present record, there are genuine issues of material fact on that issue, which underlies the question of whether Hine is a "qualified individual" under the ADA. 42 U.S.C. § 12111(8). In support of its argument that Hine cannot perform the role of an operational firefighter with or without reasonable accommodations, the County primarily relies on the testimony of Dr. Daniel G. Samo, a physician who works on the technical committee that established the NFPA hearing standard. Dr. Samo testified in his deposition that the NFPA hearing standard was authored by a committee comprised of physicians, industrial hygienists, and firefighters to establish minimum safety requirements for firefighters to perform their duties. In discussing the NFPA hearing standard, Dr. Samo testified that firefighters need to be able to rely on their hearing to locate trapped occupants, hear alarms, and understand orders. He also testified that thermal imaging technology now used to locate people trapped in a fire does necessarily identify all victims, and it is unclear whether hearing aids are able to withstand the heat and water present at a fire. For these reasons, Dr. Samo offered the view that individuals who cannot meet the NFPA hearing standard cannot perform the essential functions of an operational firefighter and are a safety threat to themselves and others.

In contrast, however, Hine has offered evidence that he could perform the functions of an operational firefighter with reasonable accommodations. This evidence includes the facts that he successfully completed fire academy training prior to applying to MVFD, and that, as he informed the County, he previously worked as an operational firefighter at three volunteer fire companies in

27

Pennsylvania: the Limerick Fire Department, the Carlisle Fire Department, and the Exeter Fire Department. It is undisputed that the Exeter Fire Department found his work "exemplary." Stipulation of Uncontested Facts ¶ 4, ECF No. 72. In a letter of recommendation, Christopher J. Bickings, the Captain of the Exeter Fire Department, stated that at "emergency scenes," Hine had the ability to "accomplish any task or assignment." J.R. 28. Hine has also provided deposition testimony on how he performed firefighter duties successfully. Specifically, he carried a thermal camera and used his cochlear implant with a cooling mask to protect it from heat damage. Finally, although Hine has acknowledged that he does not meet the NFPA hearing standard, his 2010 test results of 40 dB at a frequency of 500 Hz, 40 dB at 1,000 Hz, 40 dB at 2,000 Hz, and 35 dB at 3,000 Hz appear to place Hine very close to the benchmark set forth in the NFPA hearing standard, which is an average hearing level of no greater than 40 dB across these frequencies in the unaided, better ear.

These facts are sufficient to create a genuine issue of material fact on whether Hine can perform the functions of the position with reasonable accommodations and thus is a qualified individual. Courts have denied summary judgment on one or both of these issues even when there has been a medical opinion stating that the plaintiff cannot perform the role safely. In *Gillen*, the court reversed a grant of summary judgment where an ambulance service refused to hire a one-handed plaintiff based on a physician's opinion that she could not perform two-handed lifts, based in part on the court's conclusion that "an employer cannot slavishly defer to a physician's opinion" or "evade its obligations under the ADA . . . by "us[ing] a preemployment examination as conclusive proof of an applicant's physical capabilities." *Gillen*, 283 F.3d at 18-19, 31, 33. Notably, the court relied on evidence that the plaintiff, like Hine, was able successfully to perform the role sought, based on evidence that she served as an EMT for another department after she was

28

rejected by the defendant. *Id.* at 19, 31. Such evidence that the plaintiff or others with the same disability had previously performed the same role successfully can provide a basis for denying a motion for summary judgment based on the argument that such individuals cannot safely perform the job. *See id.*; *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926-27 (6th Cir. 2013) (reversing a grant of summary judgment because evidence that deaf individuals had successfully worked as lifeguards supported the inference that the plaintiff could, with a reasonable accommodation, perform the essential functions of the job).

Thus, while the Court finds that there is no genuine issue of material fact on the question of whether the County failed to comply with the ADA's requirement of an individualized inquiry into whether Hine can perform the role of operational firefighter, it will deny Hine's Motion for Summary Judgment because there remain genuine issues of material fact on whether Hine is a qualified individual.

## C.    Interactive Process

In the County's Cross Motion for Summary Judgment, the County argues that it is entitled to summary judgment because Hine did not provide updated hearing test results as requested by the County. The County argues that this failure not only excuses the lack of an individualized assessment, but also provides a basis for the Court to grant summary judgment in its favor, because it demonstrates that Hine failed to meet the related but distinct requirement that he engage in an "interactive process" with the County. Def.'s Mot. Summ. J. at 25-26. The ADA regulations provide that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could

overcome those limitations." *Id*. While this interactive process likely could include as a component the individualized inquiry discussed above, the interactive process is conceptually distinct in that it focuses on the need for an exchange of information and views in order to determine whether a reasonable accommodation can be identified. Courts have held that the parties are required to engage in this interactive process, because "neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135, 1137 (7th Cir. 1996); *see also Haneke v. Mid-Atl. Cap. Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005) (stating that the requirement that parties participate in an interactive process is "implicit" in a failure-to-accommodate claim and denying summary judgment because there were genuine issues of material fact on whether the "parties met their respective burdens of engaging in the interactive process in good faith, and whether that caused a failure to accommodate").

In assessing whether one side or the other was responsible for a breakdown in the interactive process, courts should "look for signs of failure to participate in good faith" or to "make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck*, 75 F.3d at 1135; *see also Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) (quoting *Beck*). The failure of the plaintiff to engage in this interactive process to identify a reasonable accommodation can provide a basis for the employer to prevail on an ADA claim. *See Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 179 (4th Cir. 2023) (rejecting a failure-to-accommodate claim based on the plaintiff's failure to pursue the interactive process where the plaintiff, after requesting a reasonable accommodation form, did not disclose how her Crohn's Disease diagnosis affected her ability to teach, suggest ameliorative measures, or even return the accommodation form); *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731,

30

736 (5th Cir. 1999) ("[C]ourts have held that an employer cannot be found to have violated the ADA when responsibility for the breakdown of the informal, interactive process is traceable to the employee and not the employer.").

In support of its claim that the failure to provide a reasonable accommodation was a result of a breakdown in the interactive process attributable to Hine, the County points to its multiple requests to Hine for current hearing test results and Hine's failure to provide those results. After the County initially denied Hine's application in March 2018 due to his hearing loss, Hine appealed the decision and submitted his 2010 audiometric test results. In a September 5, 2018 letter to Hine, the County stated that while it had received the 2010 results, it required "more current medical information" and thus specifically requested that he provide the results of an audiometric test conducted in the past six months. J.R. 48-49. The County further stated that if it received such results, "it would do another review of [Hine's] application and documentation." J.R. 49. The County also invited Hine to include additional relevant information, including relating to his previous work as an operational firefighter.

Although Hine did not provide test results from the past six months, the record does not support the conclusion that Hine failed to engage in the interactive process. Hine responded to the September 5, 2018 letter by sending an email on September 24, 2018 requesting the County schedule him for a hearing test "at no cost" to him and noted that he had sent a reference from his prior work as an operational firefighter. J.R. 52. Notably, the County neither responded to nor even acknowledged Hine's request for the County to arrange for an updated hearing test. Hine testified in his deposition that he tried to follow up on this request on multiple occasions, but the County did not reply. After his September 24, 2018 email, Hine sent two additional emails requesting an update on his application. The County then sent an email on December 12, 2018

31

reiterating that it needed current audiometric test results and granting him 30 days to provide them. Hine responded on December 29, 2018 by submitting a letter from his physician at the Amin Medical Center stating that he has permanent congenital deafness and that the hearing test he previously submitted should suffice because a subsequent hearing test would not show that his hearing had improved. In an email response on January 4, 2019, the County stated that the information would be provided "to the [Fire] Department for their review." J.R. 54. After Hine sent two additional emails seeking an update on his application, on February 13, 2019, the County sent a letter to Hine in which it referenced the September 5, 2018 request for additional information, acknowledged that Hine had responded on December 29, 2018 with the letter from Amin Medical Center, and stated that "[a]ll documentation and information submitted by you was reviewed by the Department when reconsidering your application." J.R. 59. The letter then stated, "[a]fter careful review, the Department has determined that you do not meet the standards to safely perform the essential functions of the volunteer firefighter/EMT position." J.R. 60.

This undisputed sequence of events does not support the conclusion that Hine was responsible for a breakdown in the interactive process that prevented the County from determining whether a reasonable accommodation could be identified. Rather, the record shows that Hine was consistently responsive to the County's correspondence. He provided a specific response to the September 5, 2018 request for more current hearing test results by asking for the County to provide a hearing test and then by submitting the Amin Medical Center letter through which he acknowledged that any more recent hearing test would not show improvement and thus effectively conceded that he did not meet the NFPA hearing standard. Significantly, after receiving the Amin Medical Center letter, the County never informed Hine that the letter was not an acceptable response or that the failure to provide a more current audiometric test would prevent any further

32

reconsideration of his application. It also never responded to his request to arrange for a hearing test at its expense. Rather, the February 13, 2019 letter reflects that the County accepted the Amin Medical Center letter and reconsidered the application in light of that additional information but ultimately reaffirmed its denial of the application. Notably, that letter in no way attributed the denial to the failure of Hine to submit the updated hearing test result or to otherwise respond to any requests by the County. Thus, while the County may fairly argue that the lack of a more current hearing test result, or any test showing better results than the 2010 hearing test results, was a factor that could be and was considered in its denial decision, it cannot fairly argue that Hine caused a breakdown in the interactive process where the February 13, 2019 letter demonstrates that the process did not break down over this issue and instead continued until the County made a final decision on the merits. This conclusion is reinforced by the fact that even after the denial, Hine proposed an alternative way to provide additional information relating to the determination of whether a reasonable accommodation could be found, by requesting on several occasions the opportunity to work in the role for short period of time while being monitored to demonstrate that he could perform the duties of the job. The County never agreed to this proposal for what was effectively an individualized assessment. Thus, the Court finds that the record does not support the County's claim that it should prevail based on a breakdown in the interactive process caused by Hine. The Court will deny the County's request for summary judgment on this basis.

**D.    Direct Threat**

At the hearing, the parties agreed that at this time, neither side is seeking summary judgment on the issue of whether there is a reasonable accommodation available that would permit Hine to perform the role of an operational firefighter. The County, however, has also advanced the argument it should be granted summary judgment because Hine would pose a "direct threat"

33

to the health or safety of himself or others if he were to work as an operational firefighter. *See* 42 U.S.C. § 12113(b); 28 C.F.R. § 35.139. This argument stems from a statutory defense to a claim of disability discrimination under which it "may be a defense to a charge of discrimination" that there is "an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability [that] has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation." 42 U.S.C. § 12113(a). The term "qualification standards," may include "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(a), (b); *see Chevron U.S.A., Inc. v. Echazabal*, 536 U.S. 73, 78-79 (2002). A "direct threat" consists of "significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by a reasonable accommodation." 29 C.F.R. § 1630.2(r); *see also* 28 C.F.R. § 35.139 (establishing an equivalent direct threat provision for Title II of the ADA). A determination that an individual poses a "direct threat" must be based on an "individualized assessment of the employee's present ability to safely perform the essential functions of the job" and "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r); *see also* 28 C.F.R. § 35.139(b) (providing an equivalent requirement under Title II). Among other factors, the individualized assessment must consider the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the potential harm. *See* 29 C.F.R. § 1630.2(r); *see also* 28 C.F.R. § 35.139(b).

This argument fails for two reasons. First, as discussed above, it is undisputed that the County did not conduct an individualized assessment of Hine's ability to perform the duties of an

operational firefighter and thus necessarily did not conduct the required individualized assessment of whether he could perform those functions safely. *See supra* part IV.B. Because a "direct threat" defense must be based on an individualized assessment, the Court cannot grant summary judgment to the County on this basis. *See Chevron U.S.A., Inc.*, 536 U.S. at 86.

Second, the Court finds that on the present record, there are genuine issues of material fact on whether such a direct threat exists. As discussed above, the record evidence reveals a genuine issue of material fact on whether Hine can perform the essential functions of the role with reasonable accommodations. *See supra* part IV.B. Because that same evidence necessarily addresses the question of whether Hine can perform the role safely, whether viewed in relation to the question of whether Hine can perform the functions of an operational firefighter with a reasonable accommodation or the closely related question of whether Hine would pose a direct threat to safety if he performs that role, the Court finds that there are genuine issues of material fact that preclude a grant of summary judgment to the County on the "direct threat" defense.

### E.     Proposed Accommodation

The County also asserts that it is entitled to summary judgment because it actually provided a reasonable accommodation to Hine by offering "the option to become an administrative member" of MVFD, which Hine rejected.   J.R. 59-60.   An employer may provide a reasonable accommodation other than the one requested by the employee, but such an alternative accommodation is reasonable only if it "provide[s] a meaningful equal employment opportunity," consisting of "an opportunity to attain the same level of performance as is available to nondisabled employees having similar skills and abilities." *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415-16 (4th Cir. 2015).   An individual with a disability is not required to accept a proposed accommodation, but if the individual rejects a reasonable accommodation that is necessary to

35

enable that individual to perform the essential functions of the desired position, the individual will not be considered "qualified," and the ADA claim would fail. 29 C.F.R. § 1630.9(d).

In *Reyazuddin*, the Fourth Circuit considered the ADA claim of a blind individual who served as an Information and Referral Aide at the Montgomery County Department of Health and Human Services, a role in which she answered questions from residents through the use of screen reader software and a Braille embosser. *Reyazuddin*, 789 F.3d at 411. The plaintiff, however, was not transferred to work in a new call center that used software inaccessible to blind individuals and was instead offered a position with the Department's Aging and Disability Unit, a role in which she was given "make work" tasks which often failed to constitute a full day's work. *Id.* at 412, 416. Under these circumstances, the court found a genuine issue of material fact on whether the accommodation provided the plaintiff with a meaningful equal employment opportunity and denied summary judgment in favor of the defendant. *See id.*

Here, as in *Reyazuddin*, the proposed accommodation relates to very different role than the position sought by Hine. An administrative volunteer assists with training, recruiting, fundraising, public education, accounting, income tax reporting, and administration of benefits. In contrast, a volunteer operational firefighter's duties include entering burning buildings, conducting searches, rescuing occupants, handling firehose lines, throwing and climbing ladders, operating tools and equipment, and, of course, fighting fires. Hine, who sought the operational firefighter position, argues that the administrative role is not the same because in that role, "you cannot actually fight fires." Pl.'s Reply at 8, ECF No. 78. Based on the present record, the Court finds that the administrative role would not provide Hine with a meaningful equal employment opportunity or the same benefit of the firefighting activity made available to the public.

In arguing that the administrative role is a reasonable accommodation, the County does not even attempt to claim that the administrative role provides a meaningful equal opportunity to engage in firefighting and instead argues only that it is a reasonable accommodation because administrative volunteers are eligible for the same array of benefits available to an operational firefighter, and the role is "just as valuable and essential" to the fire company as that of an operational firefighter. Def.'s Reply at 4, ECF No. 82. These arguments are of the type that would apply in cases where an employer seeks to reassign a current employee with a new or worsening disability to a different position rather than offer a reasonable accommodation that would allow the employee to continue to perform the current position. In such cases, however, a reassignment of an employee with a disability to a different position that the employee does not want generally does not constitute a reasonable accommodation when there exists a reasonable accommodation that would allow that employee to perform the duties of the current position. *See Wirtes v. City of Newport News*, 996 F.3d 234, 241-43 (4th Cir. 2021) (reversing a grant of summary judgment in favor of a police department because it had offered a detective with a disability a reassignment to a logistics manager position he did not want, where there had been no finding that he could not perform the detective position with reasonable accommodations). Such a reassignment is "strongly disfavored" and should be reserved for "unusual circumstances." *Id.* at 242-43.

Here, Hine is not interested in the administrative role and has instead testified that he aspires to advance in the field of firefighting and thereby follow in the footsteps of his father, who was previously a firefighter at MVFD. At this point, because the present record raises a genuine issue of material fact on whether a reasonable accommodation is available to permit Hine to perform the functions of an operational firefighter, the Court will not grant summary judgment to

the County based on its assertion that its offer of the administrative role constituted an offer of a reasonable accommodation declined by Hine. *See id.*; *see supra* part IV.B.

## V.   Damages

The parties agree that if Hine is successful on one or more of his claims, he is entitled to nominal damages, but they disagree on what other relief may be available to him. Where neither party has presented specific evidence on whether and in what amount Hine should receive other forms of damages, the Court finds that the issue of damages should be resolved only after a full presentation of relevant evidence at trial. Accordingly, the Court will not grant summary judgment for either party on this issue.

## CONCLUSION

For the foregoing reasons, the Cross Motions for Summary Judgment, ECF Nos. 69, 75, will be DENIED. A separate Order shall issue.

Date:  March 1, 2024

THEODORE D. CHUANG
United States District Judge